IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA MOSES, | ) | Case No. 1:19-cv-1960 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Melissa Moses, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, and because any error in the ALJ's decision was harmless, I recommend that the Commissioner's final decision denying Moses's application for DIB be affirmed.

## II.      Procedural History

On November 15, 2016, Moses protectively applied for DIB.  (Tr. 178-84).[1]  Moses alleged that she became disabled on March 29, 2016, due to anxiety, depression, type 2 diabetes, high blood pressure, and neuropathy. (Tr. 84, 179).  The Social Security Administration denied

---

[1] The administrative transcript appears in ECF Doc. 9.

Moses's application initially and upon reconsideration.  (Tr. 83-113).  Moses requested an administrative hearing.  (Tr. 132-33).  ALJ Traci Hixson heard Moses's case on May 22, 2018 and denied the claim in a September 14, 2018 decision.  (Tr. 10-82).  On July 1, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On August 26, 2019, Moses filed a complaint to obtain judicial review of the Commissioner's decision.  ECF Doc. 1.

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Moses was born on June 15, 1976, and she was 40 years old when she filed her application for DIB.  (Tr. 179).  Moses had a 12th Grade education and past relevant work as a collecting agent and office clerk.  (Tr. 38, 66-67 216).

#### B.    Relevant Medical Evidence

On November 30, 2015, Moses saw Virginia Vatev, MD for a health maintenance evaluation.  (Tr. 419, 605).  Moses described her health as good over the previous two years, but she did not have a healthy diet, had weight concerns, and did not exercise regularly.  (Tr. 419, 605).  Moses said that she was "trying to be more active[,] joined [a g]ym[,] and ha[d] lost" 16 pounds.  (Tr. 420, 606).  She said that she had bad numbness and heaviness in her feet, felt like a brick on them, and sometimes felt like they were "burning and tinkling."  (Tr. 420, 606).  Moses also said she had pain and numbness in her hands, fingers, and wrists.  (Tr. 420, 606).  On examination, Dr. Vatev noted swelling, dryness, and diminished sensation in Moses's feet.  (Tr. 423, 609).  But Moses had a normal gait and full range of motion in her extremities.  (Tr. 423-24, 609-10).  She was also oriented to time, place, and person.  (Tr. 425, 611).  Moses said work made her wrist pain better and Dr. Vatev noted that she needed to wear braces.  (Tr. 427, 613).

Dr. Vatev noted that Moses's generalized anxiety disorder was "improving and responding to treatment," and her diabetes was "variably controlled and improving." (Tr. 427, 613). Dr. Vatev adjusted Moses's medications and recommended that she lose more weight through dietary modification and exercise. (Tr. 425-27, 611-13).

At follow-up appointments between February 22, 2016, and December 22, 2016, Dr. Vatev noted that Moses continued to lose weight through exercise and medication – dropping a total of 42 pounds. (Tr. 378, 391, 409, 411, 564, 577, 594, 597). On February 22, 2016, Moses reported that she had unchanged foot and hand pain, normal gait, no lower extremity edema, no muscle weakness, no difficulty walking, no confusion, no memory lapses or losses, and no depression. (Tr. 412, 416, 598, 602). She had some joint stiffness, limb pain, and myalgias, and she was oriented to time, place, and person. (Tr. 412, 416, 598, 602). Moses's reported symptoms remained generally the same through her December 22, 2016 visit, except that on August 26, 20216, she reported that her depression, anxiety, and neuropathy pain had become worse. (Tr. 379, 383-84, 388, 391, 402-03, 407-09, 411-12, 564, 568-70, 574, 577, 588-89, 593-95, 597-98). On April 18, 2016, Dr. Vatev told Moses to schedule an appointment for pain management. (Tr. 402, 409, 588, 594). And on December 22, 2016, Dr. Vatev noted that Moses's diabetes was under "really good control" based on her lab work. (Tr. 458). Throughout this period, Dr. Vatev also maintained her recommendation that Moses lose weight through diet and exercise and prescribed medications to help control Moses's symptoms. (Tr. 389-90, 399-400, 417-18, 575-76, 585-86, 603-04).

On March 23, 2017, Moses told Dr. Vatev that she tripped while walking up the stairs with a mop and hurt her right leg. (Tr. 375, 561). There was no swelling or bruising on examination. (Tr. 374-75, 560-61). And Moses said she was continuing to exercise at the gym

and remain active, despite her constant neuropathy and wrist pain.  (Tr. 369-70, 555-56).  Dr. Vatev also noted that Moses had been diagnosed with Stage 1 endometrial cancer, which had responded well to treatment, and that she planned to get a hysterectomy and bilateral salpingo-oophorectomy.  (Tr. 375-76, 561-62).

On August 8, 2017, Dr. Vatev noted that Moses gained 8 pounds, taking her weight back to 300 pounds.  (Tr. 359, 545).  Moses said that she was in constant pain and too tired to continue exercising at the gym.  (Tr. 359, 545).  Moses reported, and examination revealed, that she had unchanged foot and hand pain, no lower extremity edema, no muscle weakness, no difficulty walking, normal gait, no joint swelling, no confusion, no memory lapses or losses, and no depression.  (Tr. 360, 364, 546, 550).  She had some joint stiffness, limb pain, and myalgias, and she was oriented to time, place, and person.  (Tr. 360, 364, 546, 550).  Dr. Vatev noted that Moses's cancer was contained, and she continued Moses's medications and recommendation that Moses lose weight through diet and exercise.  (Tr. 365-67, 551-53).

On September 8, 2017, Moses told Dr. Vatev that she had hurt her arm lifting  her godchildren, who weighed over 20 pounds.  (Tr. 349, 535).  Dr. Vatev told Moses to use a brace, icy-hot, and lidocaine for her arm.  (Tr. 355, 541).  Dr. Vatev also referred Moses to physical therapy to help with her shoulder and arm pain, and to learn how to lift better.  (Tr. 355, 541).  Moses' weight, neuropathic pain, and other symptoms remained generally unchanged from her previous examination.  (Tr. 349, 354, 535, 540).  Dr. Vatev again continued Moses's medications and recommendation for weight loss through diet and exercise.  (Tr. 357, 543).

At follow-up appointments from December 14, 2017 through February 6, 2018, Moses's reported symptoms and Dr. Vatev's findings upon examination remained generally unchanged – a normal gait, no swelling, no edema full range of motion, heaviness in her feet, numbness and

4

pain in her lower extremities and hands, and no memory or concentration problems.  (Tr. 320-21, 325-27, 332, 340-41, 345, 506-07, 511-13, 518, 526-27, 531, 689-90, 695-97, 714-15, 720-22).

Moses's diabetes, anxiety, and panic attacks remained well-controlled through medication.  (Tr. 320-21, 325-27, 332, 340-41, 506-07, 511-13, 518, 526-27, 689-90, 714-15). And Moses maintained a stable weight and said she continued trying to be active at the gym. (Tr. 320, 331, 340, 437, 506, 517, 526, 689, 714).   Despite Dr. Vatev indicating in the "review of symptoms" section of her treatment notes that Moses did not have depression, she also indicated that Moses's medications did not control her depression and adjusted her medications throughout this period.  (Tr. 328, 332, 337, 341, 347, 514, 518, 523, 526, 533, 690, 697, 715, 722).  Dr. Vatev also noted that Moses did not make a pain management appointment as was recommended in April 2016.  (Tr. 321, 332, 507, 518, 690, 715).  Dr. Vatev continued treating Moses through medication and recommended weight loss through diet and exercise.  (Tr. 697, 722).

On April 13, 2018, Dr. Vatev conducted a pain assessment.  (Tr. 678, 703).  Moses rated her neuropathy pain as a 6 on a 10-point scale.  (Tr. 678, 703).  Despite Dr. Vatev's later notation that Moses's Neurontin prescription did not help her neuropathy pain, Moses reported that 50% of her pain was relieved through medication.  (Tr. 678, 687, 703, 712).  Moses said that her pain was still severe some days, and Dr. Vatev noted that Moses had still not made a pain management appointment.  (Tr. 679, 704).  Moses's weight also dropped to 298 pounds, and Moses indicated that she was trying to be active.  (Tr. 680, 705).  Moses reported that her physical health, social health, mood, and sleep were better.  (tr. 678, 703).  She also reported that she felt emotionally stable, and her anxiety and diabetes were controlled with medication. (Tr. 680, 705).  On examination, Moses had a normal gait, no edema, and no swelling. (Tr. 686,

5

711).  Dr. Vatev again continued Moses's medications and recommended weight loss through diet and exercise.  (Tr. 687, 712).

### C.     Relevant Opinion Evidence

#### 1.     Treating Physician – Virginia Vatev, MD

On February 6, 2018, Dr. Vatev completed both a psychological function assessment and a physical function assessment for Moses.  (Tr. 491-95, 497-500).  Dr. Vatev noted that she treated Moses for hypertension, diabetes, obesity, hyperlipidemia, sleep apnea, anxiety, peripheral neuropathy, panic disorder, and other symptoms since October 2011.  (Tr. 491).  Dr. Vatev indicated that Moses had mood disturbance with depressive syndrome, anxiety, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of worthlessness, difficulty concentrating or thinking, motor tension, apprehensive expectation, vigilance, panic attacks at least once a week, obsessions, compulsions, irrational fears.  (Tr. 492).  Dr. Vatev indicated that Moses would be markedly limited in interacting with others and maintaining concentration, persistence, or pace.  (Tr. 493).  She said that Moses would be moderately limited in understanding, remembering, or applying information; adapting or managing herself; sort term memory; remembering locations and work-like procedures; and understanding and carrying out detailed but uninvolved written or oral instructions.  (Tr. 493-94).  And Moses would be mildly limited in long term memory and understanding and carrying out very short and simple instructions.  (Tr. 494).  Moses could not work with the general public but could sometimes work with coworkers and supervisors.  (Tr. 495-96).

Dr. Vatev indicated that Moses could lift or carry less than 10 pounds rarely, and never lift 10 pounds or more due to her weak arms and neuropathy.  (Tr. 498).  She indicated that

6

Moses could sit for up to 1 hour in an 8-hour workday, could stand/walk for less than 1 hour in an eight-hour workday, and required a sit/stand at will option.  (Tr. 498).  Dr. Vatev also said that Moses would need to elevate her feet every 30 minutes and would need to be reclined for 7 hours in an 8-hour workday.  (Tr. 498).  In the line under "identify the particular medical or clinical findings which support your assessment of limitations why the findings support the assessment," Dr. Vatev wrote "Does not have balance issues."  (Tr. 499).  Dr. Vatev indicated that Moses could frequently reach in all directions; rarely handle, finger, push, and pull; never feel; and occasionally operate foot controls.  (Tr. 499).  Moses could frequently rotate her head and neck; rarely stoop; and never balance, kneel, crouch, crawl, or climb stairs, ramps, ladders, and scaffolds.  (Tr. 500).  Dr. Vatev also indicated that Moses could never be exposed to unprotected heights, moving mechanical parts, operating a vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold or heat, or vibrations.  (Tr. 500).

Dr. Vatev indicated that Moses could maintain attention and concentration for 15 minutes before needing redirection or a break, required enhanced supervision, and could not maintain regular attendance or be punctual within customary tolerances.  (Tr. 494, 497).  Dr. Vatev indicated that Moses would be off-task for more than 25% of the workday, and she would miss more than 4 days per month as a result of her impairments or treatment.  (Tr. 495, 497).

On March 18, 2018, Dr. Vatev completed another physical function assessment form, noting the same limitations as in her February 6, 2018 assessment.  (Tr. 670-73).

### 2.      Consultative Examiner – Dariush Saghafi, MD

On January 12, 2017, consultative examiner Dariush Saghafi, MD assessed Moses's physical functions.  (Tr. 301-08).  Dr. Saghafi noted that Moses had poorly controlled diabetes due to a lack of monitoring equipment, neuropathic distal pains and dysesthesias in her hands

and feet, morbid obesity, and PCOS. (Tr. 303). Dr. Saghafi noted that Moses was alert and

oriented during the examination, that she was able to comprehend and articulate everything, and

that she had normal memory. (Tr. 302). Moses had normal muscle tone and bulk, as well as full

motion, in her upper and lower extremities. (Tr. 302, 305-07). Moses had decreased sensation

and deep tendinous reflexes, and she had a neuropathic gait with stabbing pains when she

walked. (Tr. 303). Moses had normal grasp and fine coordination, but she had "moderately

satisfactory" manipulation and weak pinch. (Tr. 305). Dr. Saghafi said that Moses could:

> lift, push, and pull sufficiently to be able to perform ADL's. She can lift and
> carry up to 10 lbs. [b]efore having to take a break. The claimant is able to bend,
> walk, and stand. She can be up and about for about 60 min. before having to take
> a break. The claimant is able to understand the environment as well as peers and
> communicate satisfactory. The claimant is able to travel independently.

(Tr. 303).

### 3. Consultative Examiner – Thomas Evans, Ph.D.

On January 25, 2017, consultative examiner Thomas Evans, Ph.D., assessed Moses's

psychological function. (Tr. 310-14). Dr. Evans noted that Moses drove herself to the

evaluation and was cooperative and friendly throughout it. (Tr. 310). Moses told Dr. Evans that

she was in regular classes throughout school and got along great with her fellow coworkers when

she was working. (Tr. 311). She said that she began having attendance issues, left work early,

and started feeling nervous around people. (Tr. 311). She also indicated that she was depressed

on a daily basis; rated her depression as an 8 on a 10-point scale; and said she had depressed

mood, fatigue, no motivation, poor concentration, short-term memory, and irritability. (Tr. 311).

Moses also said that she shared chores (cooking, cleaning, laundry, and grocery shopping) with

her husband, and that she spent her typical day doing household chores, watching TV, and

reading. (Tr. 312).

8

Dr. Evans noted that Moses's ambulation appeared within normal limits, she walked without assistance, and she sat comfortably in her seat throughout the entire evaluation. (Tr. 312).  Dr. Evans noted that Moses had normal speech and thought throughout the evaluation, made good eye contact, and did not have any observed features of anxiety.  (Tr. 312).  Moses was oriented, could spell forwards and backwards, recalled one out of three words after five minutes, and could recite seven digits forwards and five digits backwards.  (Tr. 313).  Dr. Evans determined that Moses had had moderate depression and anxiety.  (Tr. 313).  He concluded that Moses could maintain good attention and concentration, focus without difficulties, and get along well with supervisors and coworkers.  (Tr. 313-14).  Dr. Evans also noted that Moses could have some attendance issues due to her mood and anxiety issues based on her own reporting. (Tr. 314).

### 4.     State Agency Consultants

On February 2, 2017, state agency consultant Courtney Zeune, Psy.D., assessed Moses's mental functional capacity based on a review of the medical records.  (Tr. 87-86, 91-93). Dr. Zeune determined that Moses had a mild limitation in her ability to interact with others and moderate limitations in her ability to adapt or manage herself and her ability to concentrate, persist, or maintain pace.  (Tr. 87).  Dr. Zeune indicated that Moses did not have any understanding and memory limitations or social interaction limitations.  (Tr. 92).  Dr. Zeune determined that Moses had moderate limitations in: (1) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; (3) perform at a consistent pace without an unreasonable number and length of rest periods; and (4) the ability to respond appropriately to changes in the workplace.  (Tr. 92).

On April 14, 2017, Kristen Haskins, Psy.D., concurred with Dr. Zeune's opinion, except Dr. Haskins determined that Moses was not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.[2]  (Tr. 103, 107-09).

On January 17, 2017, state agency consultant Maureen Gallagher, DO, assessed Moses's physical functional capacity based on a review of the medical records.  (Tr. 89-91, 94). Dr. Gallagher determined that Moses could lift up to 20 pounds occasionally and 10 pounds frequently; stand or walk for a total of 4 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and push/pull without limitation.  (Tr. 89).  Moses could: (1) frequently stoop, kneel, crouch, and crawl; (2) occasionally climb ramps/stairs and balance; and (3) never climb ladders, ropes, or scaffolds.  (Tr. 90).  Moses was unlimited in reaching, handling, and feeling, but she was limited to frequent fingering.  (Tr. 90).  Dr. Gallagher also determined that Moses would need to avoid concentrated exposure to hazards, such as machinery and unprotected heights.  (Tr. 91).  Dr. Gallagher specifically noted that Moses's medical records showed that Moses could "walk and use [her] arms, hands, and legs in a satisfactory manner."  (Tr. 95). Based on her assessment of Moses's physical functional capacity, Dr. Gallagher determined that Moses was capable of light work.  (Tr. 94).  On April 17, 2017, Mehr Siddiqui, MD, concurred with Dr. Gallagher's opinion, but indicated that Moses was only cable of sedentary work. (Tr. 104-07, 110).

---

[2] Dr. Haskins's assessment of Moses's mental functional capacity also differed from Dr. Zeune's in that Dr. Haskins indicated that Moses had understanding and memory limitations and social interaction limitations.  (Tr. 107-08).  Nevertheless, Dr. Haskins also indicated that none of these additional limitations were significant or supported by evidence.  (Tr. 107-08).

### D.    Relevant Testimonial Evidence

Moses testified at the ALJ hearing.  (Tr. 38-62).  Moses testified that, on the typical day, she got up around 11:00 or 12:00, ate a bowl of cereal, sat in her recliner, fell asleep throughout the day, and waited for her husband to come home for dinner.  (Tr. 41).  Moses said that she did not cook except with the microwave, and that her husband did all the cooking and shopping.  (Tr. 39).  If she went shopping with her husband, she used a motorized cart.  (Tr. 40).  Moses rinsed dishes to put in the dishwasher and folded clothes while sitting down.  (Tr. 39).  Her hobbies included reading and watching television, and she did not belong to any organizations.  (Tr. 40).  She could usually read for half an hour before she fell asleep.  (Tr. 61).  Moses testified that she rarely drove, and then only to go to the doctor.  (Tr. 38).  Moses had a dog, and she either had her sisters take care of it, left the door open for it on nice days, or let it "potty in the house" until her husband came home.  (Tr. 42).  Her husband fed and watered the dog.  (Tr. 42).

Moses testified that she last worked as a "legal coordinator" for JP Recovery Services in March 2016.  (Tr. 43).  In that position, she "look[ed] for ways to sue people for medical bills if they [were] unpaid, look[ed] for housing if they own[ed] houses or any types of" other assets.  (Tr. 43).  She mostly performed her job seated, walked between the copier and file cabinet, and rarely talked on the phone.  (Tr. 44).  She said that she left her job because it became hard to type and sit without elevating her legs.  (Tr. 44, 59).  Before working at JP Recovery Services, Moses worked at Clean Harbors Environmental Services, answering phones, filing, using a computer.  (Tr. 45).

Moses testified that she believed she could not work because she was in pain for 85% of the day.  (Tr. 45).  She had pain and numbness in her hands, fingers, legs, and feet.  (Tr. 46).  She spent most of her day sitting and used a massaging machine on her legs and feet for temporary

pain relief.  (Tr. 46).  Moses said that her doctor tried to get her to see a neurologist about medication, but there was nothing more they could do.  (Tr. 46-47).  Moses said that her diabetes and blood pressure were steady and under control through her diet, but she did not monitor her blood sugar.  (Tr. 47).  Moses stopped going to the gym because she couldn't afford it.  (Tr. 47).

Moses also testified that she had a hard time concentrating and remembering things. (Tr. 49).  She also had crying spells a few times while she was working, and she had to call her husband to pick her up.  (Tr. 49).  Moses took several medications for her mental health.  (Tr. 49-50).  Her medications sometimes made her feel nauseous, light headed, and tired.  (Tr. 41, 50, 56).  She sometimes felt dizzy and slipped.  (Tr. 50).  Moses said that she did not get counseling for her anxiety and depression, and she liked staying at her house and not going anywhere. (Tr. 50).  Moses avoided going to large gatherings because she would have panic attacks. (Tr. 55-56).

Moses testified that she could lift no more than 10 pounds, per Dr. Vatev's orders. (Tr. 52).  She could stand for 10 minutes before she sat down, and she would only get up to use the restroom or get a drink.  (Tr. 52).  She always elevated her legs when she sat, unless she was using her massaging machine.  (Tr. 52).  She said that if her feet and legs were not elevated, she was in "tons of pain."  (Tr. 62).  Moses said that she could walk down the street "maybe like a house or two down," and mostly restricted her walking between the kitchen and the restroom on the first floor of her house.  (Tr. 53).  She only used the stairs when her husband was home because she sometimes lost her balance.  (Tr. 53).

Larry Taki, a vocational expert ("VE") also testified at the hearing.  (Tr. 63-81).  The ALJ asked the VE whether a hypothetical individual with Moses's age, education, and experience could work if she:

12

could lift and carry 20 pounds occasionally, 10 pounds frequently; stand and walk for four hours in an eight-hour day; sit for six; occasionally climb stairs and ramps, but no ladders, ropes or scaffolding.  This person can occasionally balance, stoop, kneel, crouch but is not crawling.  This person can reach in all directions.  This person can frequently handle, finger, and feel but would not be exposed to unprotected heights or dangerous machines or commercial driving and would perform simple, routine tasks with simple, short instructions, make simple decisions, have few workplace changes with no fast-paced production requirements.

(Tr. 68).  The VE testified that such an individual could not perform Moses's past work, but could work as a price marker, subassembler of electronics, and collator operator.  (Tr. 66-70).  The jobs identified were light duty but could be performed with a sit/stand option based on the VE's experience.  (Tr. 69-70).  If the hypothetical were modified to restrict the individual to lifting up to 10 pounds occasionally, five pounds frequently, standing/walking for two hours, and sitting for six hours, the individual could work as an addresser/address clerk, table worker, or touch-up screener.  (Tr. 71).  If fingering were limited to occasional bilaterally, all the identified jobs would be eliminated; however, the VE said that such an individual could work as a surveillance system monitor at the sedentary level.  (Tr. 72).  The VE also said that, if a leg-raising limitation were added to the second hypothetical, then the available work would be unaffected by elevating legs up to 19 inches, but no work would be available if elevation were at heart-level.  (Tr. 74-75).  The VE also testified that work would be precluded if an individual were off-task more than 10 to 15 percent of the workday on an ongoing basis.  (Tr. 78).  If an individual needed a 10-minute break every hour, that would be work-preclusive.  (Tr. 78).

## IV.    The ALJ's Decision

The ALJ's September 19, 2018, decision found that Moses was not disabled and denied her claim for DIB.  (Tr. 13-28).  The ALJ found that Moses had the severe impairments of: "diabetes mellitus; diabetic neuropathy; carpal tunnel syndrome; obesity; depressive disorder;

and generalized anxiety disorder. (Tr. 16). The ALJ also determined that none of Moses's impairments, singly or in combination, met or medically equaled a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16-20). The ALJ made numerous specific findings concerning the applicability of the Listings; however, because Moses raises no issue in this action contending those findings were erroneous, it is unnecessary to summarize the ALJ's Listings analysis.

The ALJ found that Moses had the RFC to perform a range of sedentary work, except that she could:

> occasionally climb ramps and stairs; no climbing ladders, ropes or scaffolds; occasionally balance, stoop, kneel, and crouch; no crawling; can reach; frequently handle, finger, and feel; no exposure to unprotected heights, dangerous machinery and commercial driving; limited to performing simple routine tasks with simple short instructions; limited to making simple decisions, have few workplace changes, and no fast pace production requirements.

(Tr. 20). In evaluating Moses' RFC, the ALJ expressly stated that she "considered all symptoms" in light of the medical and other evidence. (Tr. 20). The ALJ discussed Moses's testimony that "no medication helps her diabetic nerve pain;" that "she is in pain 85% of the day;" that "she can lift 10 pounds, stand 10 minutes, and walk one block;" and that "she is unable to concentrate and does not remember things." (Tr. 20-21). And the ALJ extensively summarized Moses's treatment records related to both her physical and mental impairments, including notes indicating that she was able to control her pain and diabetes with medication; she had a normal gait and full range of motion; she never sought treatment with a pain specialist despite being referred for pain management; and she had only mild depression and anxiety that improved with treatment. (Tr. 21-23).

The ALJ also stated that she gave: (1) "partial weight" to Dr. Gallagher's and Dr. Siddiqui's opinions; (2) "considerable weight" to Dr. Zeune's, Dr. Haskin's, and

Dr. Saghafi's opinions; (3) "significant weight" to Dr. Evans's opinion; and (4) only "limited weight" to Dr. Vatev's opinions.  (Tr. 23-25).  Regarding Dr. Vatev's opinions, the ALJ explained:

> The undersigned accords limited weight to the opinion of Virginia Vatev, M.D., the claimant's treating physician.  On February 6, 2018, Dr. Vatev noted that she had been treating the claimant since October 2011 and she was an internal medicine specialist.  Dr. Vatev opined that the claimant had the following symptoms: appetite disturbance, sleep disturbance, decreased energy, feelings of guilt, difficulty concentrating, apprehension, vigilance, panic attacks, obsessions and persistent irrational fears.  Dr. Vatev also opined that the claimant has panic in crowds, OCD behavior, and was moderately limited in her ability to understand, remember or apply information.  Finally, Dr. Vatev opined that the claimant had marked limitations in her ability to interact with others, concentrate, persistent and maintain pace, and moderate limitations in her ability to adapt or manage herself, and she would be off-task 25% of a workday.  Pursuant to 20 CFR 404.1527, if a treating source opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, we will accord the opinion controlling weight.  The undersigned accords this opinion limited weight, rather than controlling weight, as it is inconsistent with the medical evidence of record.  Specifically, the medical evidence does not reflect treatment notes for OCD or problems with memory or off-task behavior.  Additionally, the medical evidence shows that the claimant had improvement with medications.

> The undersigned accords limited weight to Dr. Vatev's other opinions.  On February 6, 2018, Dr. Vatev opined that the claimant would be absent from work 4 or more days per month, could rarely lift and carry less than 10 pounds, sit for 1-hour total in an 8-hour workday and could stand and walk less than an hour in an 8-hour workday.  Dr. Vatev also opined that the claimant would need to lie down or recline for 7 hours in an 8-hour workday, could rarely handle, finger, push and pull, and never climb, balance, kneel, crouch, crawl or work around environmental hazards.  On March 18, 2018, Dr. Vatev reiterated her opinion that the claimant would be off-task 25% of a workday, would be absent 4 or more days per month, and would be unable to perform postural moves or work around environmental hazards.  The undersigned accords these opinions limited weight, rather than controlling weight, as the extensive limitations noted in these opinions are not supported by treatment notes.  Specifically, there is no diagnosis that supports environmental limitations, such as asthma or problems breathing. Reclining for 7 hours is not a medically prudent restriction as it is not healthy for the circulatory system. Further that restriction is not warranted by any of the claimant's diagnosed conditions.  Dr. Vatev encouraged the claimant to join a gym, which is inconsistent with her statements that the claimant is unable to balance and can only stand and walk less than an hour.

(Tr. 24-25).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion upon fresh review or if the evidence could have supported a different conclusion.  42 U.S.C. § 405(g); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error

16

was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision
. . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error
prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.
Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review
decisions of administrative agencies for harmless error.").  Furthermore, the court will not
uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical
bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.
Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.
Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant
evidence is not mentioned, the court cannot determine if it was discounted or merely
overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio
Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.
July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.
Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a
reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine
whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial
gainful activity; (2) if not, whether the claimant has a severe impairment or combination of
impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals
any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant
can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the
claimant's age, education, and work experience, she can perform other work found in the
national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d

640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

      **B.**      **Weighing of Dr. Vatev's Opinion**

Moses argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in giving Dr. Vatev's opinions less-than-controlling weight. ECF Doc. 12 at 6-13.  Specifically, Moses contends that the ALJ should have credited and integrated into the RFC Dr. Vatev's opinions that she would "be off-task due to her symptoms and [would] need to need to recline often due to the extent of her symptoms relating to her severe peripheral neuropathy."  ECF Doc. 12 at 9.  Moses asserts that the ALJ's stated reasons for rejecting these limitations from Dr. Vatev's opinions were not "good reason" and that evidence in the record was consistent with Dr. Vatev's opinions.  ECF Doc. 12 at 9-12.  Further, Moses argues that there was "no **credible** evidence to detract from Dr. Vatev's opinion."  ECF Doc. 12 at 12 (emphasis in original).

The Commissioner responds that the ALJ properly fulfilled her duty to resolve the conflict between disparate opinions in the record and gave "good reasons" for discounting Dr. Vatev's opinions.  ECF Doc. 14 at 7-8.  Although the Commissioner concedes that the ALJ's statement that reclining for seven hours is not a medically prudent restriction, was not a "good reason," any error in making that statement was harmless because the ALJ gave other "good reasons" for giving Dr. Vatev's opinion "limited weight."  ECF Doc. 14 at 8-10 & n.5.  Further, the Commissioner argues that substantial evidence supports the ALJ's decision to give "limited weight" to Dr. Vatev's opinions.  ECF Doc. 14 at 5-7.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. § 404.1527(c).  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; (2) inconsistency with or contradictory findings in the treating source's own records; and (3) inconsistency with other substantial evidence in the case record.  *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017) ("An ALJ is *required* to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record." (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart*, 710 F.3d 365, 376; *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (stating that good reasons include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.").  But inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary

requirements, the physician's familiarity with other information in the record, and other factors

that might be brought to the ALJ's attention.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R.

§§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  Nothing in the regulations requires the ALJ to explain

how she considered each of the factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Biestek*, 880

F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor.").

However, the ALJ must at least provide good reasons for the ultimate weight assigned to the

opinion.  *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a

claimant's procedural rights and permit meaningful review, 20 C.F.R. § 404.1527(d)(2) (and

§ 416.927(d)(2)) require the ALJ to articulate good reasons for the ultimate weight given to a

medical opinion).  When the ALJ fails to adequately explain the weight given to a treating

physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating

physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r*

*of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons

affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n]

the conclusion of the ALJ may be justified based upon the record.'"  (citing *Rogers*, 486 F.3d at

243)).

I find that the ALJ provided "good reasons" for discounting Dr. Vatev's opinions.  42

U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by stating that

she gave Dr. Vatev's opinions "limited weight" because Dr. Vatev's opined limitations were

inconsistent with evidence in the medical record and not supported by Dr. Vatev's own treatment

notes.  *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c); (Tr. 24-25).  An inconsistency with

treatment notes and other evidence in the medical record are among the reasons that can

independently justify an ALJ's decision to give less-than-controlling weight to a treating

physician's opinion.  *See Biestek*, 880 F.3d at 786; *Winschel*, 631 F.3d at 1179; *Gayheart*, 710 F.3d at 376-77.  As the Commissioner concedes, the ALJ improperly gave her own medical judgment regarding Dr. Vatev's opinion – by stating that "[r]eclining for 7 hours is not a medically prudent restriction."  ECF Doc. 14 at 8 n.5; (Tr. 25); *see Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) (An "ALJ may not substitute his own medical judgment for that of the treating physician.").  Nevertheless, because the ALJ provided other reasons that could independently justify discounting Dr. Vatev's opinions, any error in providing the ALJ's own medical judgment was harmless.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (An error in weighting medical opinion sis harmless when "the Commissioner has met the goal of § 1527(d)(2) – the provision of the procedural safeguard of reasons.").

Substantial evidence also  supported the ALJ's decision to discount Dr. Vatev's opinions. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.  Here, the ALJ could have reasonably concluded that Dr. Vatev's opinion – that Moses would need to raise her legs for 7 hours in an 8-hour workday – was inconsistent with other evidence in the record, including such evidence as: (1) Moses's own statements during treatment and examinations that her health was good, that she tried to be more active and joined a gym, that she was able to climb stairs with a mop, that she had no walking difficulty or muscle weakness, that she was able to lift her godchildren who weighed over 20 pounds, and that she was able to share household chores with her husband; (2) Moses's April 2018 statements that her medication relieved 50% of her neuropathy pain and that her physical health was better; (2) Dr. Vatev's own findings that Moses had a normal gait, full range of motion, no swelling, and could exercise and lose weight to relieve her symptoms; (3) Moses's noncompliance with Dr. Vatev's recommendation that she seek pain management; (4) Dr. Saghafi's notes that Moses had normal muscle tone and bulk, full

range of motion, and the ability to stand or walk for 60 minutes; and (5) Dr. Evans's notes that Moses was able to sit comfortably throughout his examination.  (Tr. 302-07, 312, 320-21, 325-27, 332, 340-41, 345, 349, 357, 360, 364, 369-70, 374-75, 378-79, 383-84, 388-91, 399-400, 402-03, 407-09, 411-12, 416-20, 423-27, 506-07, 511-13, 518, 526-27, 531, 535, 543, 546, 550, 555-56, 560-61, 564, 568-70, 574-77, 585-86, 588-89, 593-95, 597-98, 602-06, 609-13, 678-80, 687, 689-90, 695-97, 703-05, 712714-15, 720-22).  Further, the ALJ could have reasonably concluded that Dr. Vatev's opinion – that Moses would be off-task for more than 25% of the workday – was inconsistent with evidence in the record, including: (1) Moses's own statements at treatment sessions that she no confusion, no memory lapses or losses, and no depression; (2) Moses's April 2018 statement that her social health, mood, and sleep were better; (3) Dr. Vatev's notes indicating that Moses was fully oriented at all treatment sessions and that her medications adequately treated her anxiety; (4) Dr. Saghafi's notes that Moses had a normal memory and was able to comprehend and articulate everything during her examination; (5) Dr. Evans's opinion that Moses could maintain good attention, concentration, and focus; (6) Dr. Zeune's and Dr. Haskins's opinions that Moses had no more than moderate limitations in her ability to perform within a schedule, maintain regular attendance, perform at a consistent pace, and avoid interruptions from her psychologically-based symptoms.  (Tr. 92, 107-09, 302, 313-14, 320-21, 325-27, 332, 340-41, 345, 360, 364, 416, 425, 427, 506-07, 511-13, 518, 526-27, 531, 546, 550, 598, 602, 611, 613, 680, 689-90, 695-97, 712, 714-15, 720-22).  Thus, because the ALJ reasonably drew from the record evidence support for her decision to discount Dr. Vatev's opinion, the decision fell within the commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545; *Rogers*, 486 F.3d at 241.  And, even if this court would find that evidence supported Moses's

22

claim upon a *de novo* review of the record, the court may not decide the facts anew or re-weigh the evidence.  *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Accordingly, Moses has not met her burden to establish that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in discounting Dr. Vatev's opinions regarding her leg-lifting and off-task behavior.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Moses's application for DIB be affirmed.

Dated: May 29, 2020

Thomas M. Parker
United States Magistrate Judge

_____

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).